IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARVA BAEZ, Individually and** | : | **CIVIL ACTION** |
| **as Administratrix of the Estate of** | : | |
| **Luis Villafane, deceased** | : | |
|        **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 09-2745** |
| | : | |
| **LANCASTER COUNTY, et al.,** | : | |
|        **Defendants** | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                                                                         **October 18, 2011**

This is the unfortunate case of Luis Villafane who took his own life while incarcerated at Lancaster County Prison ("LCP"). Plaintiff, Marva Baez, brings this civil rights action on behalf of her deceased brother as the Administratrix of his estate. The Plaintiff alleges claims against Lancaster County, Warden Vincent Guarini, and several prison employees for failing to prevent his tragic suicide. These claims primarily allege constitutional violations under 42 U.S.C. § 1982.[1]

In addition to allegations against the Lancaster Defendants, Plaintiff initially filed this suit against PrimeCare Medical, Inc. ("PrimeCare") and medical personnel who treated Mr. Villafane. The medical personnel determined that Mr. Villafane was not suicidal and could be housed in general population rather than remain on suicide status in the medical housing unit. Plaintiff subsequently withdrew all claims against PrimeCare

---

[1] Plaintiff asserts a claim against individual defendant Officer Byrd for his deliberate indifference in preventing the suicide of Mr. Villafane, a claim of excessive force against individual defendant Sergeant Jacob for use of excessive force, and derivative Monell and supervisory claims against Lancaster County and Warden Vincent Guarini.

and the medical personnel. The remaining defendants in this case filed a motion for summary judgment. For the reasons set forth below, I will grant the motion.

I. BACKGROUND[2]

A. Mr. Villafane's Admission to LCP

Mr. Villafane was committed to LCP as a pre-trial detainee on September 22, 2008, after he was arrested on two charges of rape, aggravated assault, indecent assault and corruption of a person less than 13 years of age stemming from the sexual assault of a child in 2001. (Doc. No. 24, ¶ 1-2.) On the same day that he entered LCP, Nurse Holly Campbell evaluated Mr. Villafane and asked him a series of questions about his medical and mental history. (Id. at ¶ 3.) Although Mr. Villafane stated that he was not feeling suicidal, Nurse Campbell placed Mr. Villafane on suicide watch because he claimed that he had recently experienced the loss of his mother, he answered "no" when asked if he had anything to look forward to, and he stated that he had previously attempted suicide. (Id. at ¶ 4.)

The following day, Dr. Robert Shambaugh, an outside medical provider for LCP, evaluated Mr. Villafane pursuant to PrimeCare's procedures. (Id. at ¶ 2.) Dr. Shambaugh is a clinical psychologist employed by PrimeCare as the mental health

---

[2] I have viewed the facts in the light most favorable to the Plaintiff, as the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Plaintiff disputes only fourteen of the Defendants' 103 paragraphs in the Defendants' Statement of Undisputed Material Facts (Doc. No. 24). Plaintiff specifically admits all of the remaining facts. See Plaintiff's Response to Defendants' Statement of Undisputed Material Facts at 1, n. 1 (Doc. No. 30-1) (". . . Plaintiff does not list the remaining numbered facts but rather admits them.") Where the facts are not disputed, I cite the paragraphs from the Defendants' Statement of Undisputed Material Facts after my careful examination of the record. I have also examined the Plaintiff's thirteen additional material facts, all of which are disputed by the defendants, and referenced the Plaintiff's Statement of Additional Disputed Material Facts (Doc. No. 30-1) where the plaintiff has accurately cited to the record.

supervisor for LCP. (Id. at ¶ 5.) LCP and PrimeCare have a policy, program and procedure outlining different levels of suicide and mental health procedures for inmates for the purpose of preventing psychotic or depressed inmates from harming themselves and attempting to commit suicide.[3] (Id. at ¶ 92-93.) After evaluating Mr. Villafane, Dr. Shambaugh cleared him for general population because he was relaxed, calm, and in good spirits and denied having any suicidal thoughts. (Id. at ¶ 5.) Dr. Shambaugh opined that Mr. Villafane did not present a serious risk for suicide. (Id. at ¶ 8.) Dr. Shambaugh[4] also opined that inmates who are taken off suicide status might still be suicidal. (Doc. No. 30, ¶ 8.)

### B. Use of Force Incident

On November 1, 2008, at approximately 8:18 p.m., Mr. Villafane was in line with other inmates for church services on Pod G-1, where he was housed. (Doc. No. 24, ¶ 11.) Officer Andrew Brommer gave standard instructions to inmates, including Mr. Villafane, not to talk in the hallway while lining up for church. (Id. at ¶ 4.) Mr. Villafane started to yell "Ok, tough guy" while Officer Brommer was attempting to speak. (Id. at ¶ 14.) Officer Koltz, who observed that Mr. Villafane was disobeying Officer Brommer's instructions, asked Mr. Villafane to step out of line, informed him that he was not permitted to go to church, and instructed Mr. Villafane to secure to his cell. (Id. at ¶ 15.) Mr. Villafane demanded to speak to a supervisor. (Id. at ¶ 17.) Officer Koltz called Sergeant Jacob, the sergeant on duty, and told him that he had given Mr. Villafane

---

[3] The National Commission on Correctional Health Care has found LCP to be compliant with the NCCHC Standards for Health Services in Jails since 1999, including 2008. (Id. at ¶ 94.)
[4] Plaintiff misspells various names in her Complaint, Response and Amended Response. I will assume she is referencing Dr. Shambaugh, a previous defendant in this case.

several instructions to secure to his cell and that Mr. Villafane was disobeying those instructions and demanding to see a supervisor. (Id. at ¶ 17.) Sergeant Jacob could hear Mr. Villafane yelling in the background that he wanted to see a supervisor. (Id. at ¶ 18.) Sergeant Jacob told Officer Koltz to instruct Mr. Villafane to return to his cell or he would come down and return him to his cell. (Id. at ¶ 19.) When Mr. Villafane again refused to return to his cell, Officer Koltz called a Code 13, which means an officer needs assistance. (Id. at ¶ 21.)

Sergeant Jacob left the office, accompanied by Officer Brackbill and Officer Zimmerman, to enter Pod G-1. (Id. at ¶ 22.) Sergeant Jacob asked Mr. Villafane to lock up and Mr. Villafane said "no." (Id. at ¶ 23.) Sergeant Jacob began to escort Mr. Villafane by taking hold of his left arm as Officer Zimmerman took hold of Mr. Villafane's right arm. (Id. at ¶ 23.) As they began to escort Mr. Villafane, Mr. Villafane struggled and resisted, despite Sergeant Jacob's instructions to stop resisting. (Id. at ¶ 24.)[5] As the officers were attempting to put Mr. Villafane's hands behind his back, the officers fell to the floor with Mr. Villafane as he continued to struggle. (Id. at ¶ 25.) Sergeant Jacob gave repeated instructions for Mr. Villafane to stop resisting, but Mr. Villafane ignored these instructions. (Id. at ¶ 26.) Sergeant Jacob then deployed the Electronic Body Immobilization Device ("E.B.I.D.") between Mr. Villafane's shoulder blades for approximately 9-10 seconds. (Id. at ¶ 26.) The E.B.I.D. has a safety timer that

---

[5] Plaintiff objects to the Defendants' characterization of this incident as a "struggle" and cites to the deposition of inmate Norman McMillan for factual support. See Document No. 30-1, ¶ 24. Plaintiff also disputes that the plaintiff and officer fell to the ground and that plaintiff continued to resist and again cites to the deposition of Mr. McMillan. Id. at ¶ 25. Mr. McMillan testified that Mr. Villafane and Officer Jacob were "rumbling and tussling" on the ground. McMillan Dep 22:10. Clearly, a "struggle" is an accurate characterization.

prevents it from being dispersed for more than 15 seconds. (Id. at ¶ 27.) A few seconds after using the E.B.I.D., Mr. Villafane pulled his arms out from underneath him and the officers were able to get control of his arms and handcuffed him. (Id. at ¶ 28.)

After Mr. Villafane was handcuffed, officers escorted him to the medical unit. (Id. at ¶ 29.) The officers stayed with him while Nurse Stephanie Astree and Nurse Campbell examined him. (Id. at ¶ 29.) Mr. Villafane stated that he was having thoughts of hurting himself which had been getting worse since his mother had died. (Id. at ¶ 31.) Nurse Campell placed Mr. Villafane on Suicide Status I. (Id.) Mr. Villafane was treated for a chipped front tooth and a laceration to his lip, which required treatment at Lancaster General Hospital. (Id. at ¶ 30.)

### C. Dr. Shambaugh's Evaluation

Dr. Shambaugh evaluated Mr. Villafane when he returned to LCP from the hospital. (Id. at ¶ 34.) Mr. Villafane asked to be in the medical housing unit because he was "stressing" but never admitted to Dr. Shambaugh that he was having suicidal thoughts. (Id. at ¶ 34.)[6] Dr. Shambaugh's clinical impression was that Mr. Villafane did not want to go to Pod C-2, where inmates with misconducts are housed, so Mr. Villafane asked to serve his discipline in medical housing where there are nicer accommodations. (Id. at ¶ 35.) Although Dr. Shambaugh did not believe that Mr. Villafane was suicidal, he informed Mr. Villafane that he could continue to stay in medical housing and could take all the time he needed there. (Id. at ¶ 37.) Dr. Shambaugh placed Mr. Villafane on

---

[6] Plaintiff disputes this fact; however, Dr. Shambaugh testified, "He never admitted to me, 'I'm thinking about suicide.' He never told me that." Shambaugh Dep. 30:13-14.

Suicide Status I. (Id.) While on suicide status, Mr. Villafane was housed in a camera cell where he was randomly checked on by officers and given only a smock to wear. (Id. at ¶ 38.)

On November 3, 2008, medical personnel downgraded Mr. Villafane to Suicide Status II. (Id. at ¶ 39.) He remained in a camera cell, he received a jumpsuit to wear, and officers randomly checked on him. (Id. at ¶ 40.) On November 7, 2008, medical personnel evaluated Mr. Villafane and he denied suicidal ideation. (Id.) Medical personnel downgraded Mr. Villafane to Level 4 ("MHIV"), which is general observation. (Id.) While on MHIV, Mr. Villafane received regular checks, not random checks. (Id. at ¶ 41.) Mr. Villafane was not on suicide status from November 7, 2008 to November 18, 2008. (Id. at ¶ 42.) During this time, he had access to sheets, blankets, and his possessions. (Id.)

On November 13, 2008, Mr. Villafane informed medical personnel that he was ready to be returned to general population the following Monday. (Id. at ¶ 43.) Dr. Shambaugh made the decision to return Mr. Villafane to general population after observing that his mood had improved gradually, he was not depressed, he was forward-looking, he wanted his personal belongings back, and he wanted to be back with the other inmates. (Id. at ¶ 44.) Dr. Shambaugh testified that Mr. Villafane's mood appeared normal and he was not distressed. (Id. at ¶ 46.) Dr. Shambaugh communicated his release of Mr. Villafane from suicide and mental health observation to LCP staff. (Id. at ¶ 45.)

### D. Mr. Villafane's Suicide

On November 19, 2008, Mr. Villafane was released from suicide watch and moved to Pod C-2, the disciplinary ward. (Id. at ¶ 48.) Corrections Officers Dale Byrd and Jeff Christner were assigned to Pod C-2. (Id.) Officer Byrd escorted Mr. Villafane to his cell and testified that he was not aware of Mr. Villafane's precise charges, although he was aware of the nature of the charges because Mr. Villafane was moved from the block where sexual offenders are housed.[7] (Id. at ¶ 52, Doc. No. 30, ¶ 52.) Officer Byrd asked Mr. Villafane numerous times if he was "ok" because he knew that Mr. Villafane was coming off suicide watch. (Doc. No. 28, ¶ 52.) Officer Byrd testified that Mr. Villafane's demeanor was generally upbeat and cheerful on the day of the incident.[8] (Id. at ¶ 53.) Inmate Abraham Sanchez testified that Mr. Villafane said he was going to kill

---

[7] The Plaintiff alleges a routine practice by correctional officers where correctional officers discuss charges brought against inmates in front of other inmates. The plaintiff cites many irrelevant facts, including facts of an unrelated case involving an unrelated inmate on inmate assault in Eichelman v. Lancaster Cnty., 510 F. Supp. 2d 377 (E.D. Pa. 2007). Relevant to this case, Plaintiff claims that "Prior to his suicide, correctional officers told the inmates on the C-2 block that Villafane was a sex offender and specifically that the charges involved sexual abuse of an eight year old girl." (Doc. No. 30 at ¶ 7.) The Plaintiff cites to hearsay statements in the deposition testimony of three inmates to support her contention. Inmate Barry Gentry testified that he overheard "Mooch," an inmate who has not been identified, tell other inmates, that he (Mooch) overheard Mr. Villafane's charges. This statement is unreliable hearsay within hearsay and will not be considered to defeat summary judgment. Likewise, Inmate Abraham Sanchez did not personally hear any of the guards tell any inmates that Mr. Villafane was a sexual offender; rather, he heard other inmates say they (the other inmates) overheard a correctional officer call Mr. Villafane a sexual offender. Again, this statement is unreliable hearsay within hearsay and will not be considered to defeat summary judgment. Inmate Norman McMillan testified that he heard of Mr. Villafane's charges when Mr. Villafane told him about the incident. Mr. McMillan could not name any guard who may have announced Mr. Villafane's charges and stated that prisoners learned of an inmate's charges by reading newspaper articles or, in this case, when Mr. Villafane told Mr. McMillan about his charges. Mr. McMillan could never remember a time when a prison guard "outrightly put the information out there" about an inmate's charges and made a public announcement. Plaintiff asserts that inmate on inmate taunting was a cause of Mr. Villafane's suicide. However, Plaintiff is unable to point to any admissible material fact to support her contention that the statement of a correctional officer caused the inmate taunting of Mr. Villafane. Additionally, Officer Byrd testified that he never seeks out information regarding inmates' charges and that he did not know Mr. Villafane's charges. Officer Plummar also testified that he did not know Mr. Villafane's charges.

[8] LCP Corrections Officers, including Officer Byrd, attend Metal Health/Suicide Prevention training annually. (Doc. No. 28, ¶ 95.) On September 24, 2008 through September 27, 2008, LCP officers received a refresher course on suicide and mental health issues. (Id. at ¶ 96.) Officer Byrd also attended a training program entitled "Suicide Prevention and Intervention Training" on October 24, 2008. (Id. at ¶ 97.)

himself while Officer Byrd was within earshot. (Doc. No. 30, ¶ 52.) However, Officer Byrd testified that he did not hear Mr. Villafane say he was suicidal, and if he had, his practice was to alert a supervisor who would then contact the medical housing unit. (Doc No. 28, ¶ 102.) Approximately 25 minutes prior to the incident, Officer Byrd heard Inmate Norton call Mr. Villafane a snitch. (Id. at ¶ 54.) Officer Byrd told Mr. Villafane if he had any problems or started thinking stupid thoughts, to get him and talk to him. (Id.) Mr. Villafane replied, "Ok, I'm good." (Id.)

On the date of the incident, Officer Byrd patrolled the block routinely and checked each cell visually throughout his shift.[9] (Id. at ¶ 55.) He checked the block at 1:15 p.m. (Id. at ¶ 82.) Sometime after 1:15 p.m. and before 1:54 p.m., Mr. Villafane ripped his bed sheets and created a noose for which to hang himself. (Id. at ¶ 82.) Some inmates believed that Mr. Villafane was pretending to hang himself to get off the disciplinary block or that he was just joking. (Id. at ¶ 83.) Some inmates began yelling "Code Blue" while others were yelling louder to keep the officers from hearing "Code Blue."[10] (Id.) The C-2 block is notoriously louder than other blocks and it is not unusual for inmates to yell. (Id. at ¶ 78.)

Inmate Brandon Betancourt was sweeping and cleaning the tier. (Id. at ¶ 57.) When Mr. Betancourt arrived outside of Mr. Villafane's cell, it looked like Mr. Villafane had hung himself, but Mr. Betancourt walked away and started cleaning again because he

---

[9] Plaintiff disputes this statement and cites to Officer Byrd's testimony regarding LCP procedures when conducting full inspections ("shakedowns") of only 4 cells a day. However, correctional officers also routinely patrol the entire cellblock approximately each half hour and check each cell visually to ensure that the inmate is still okay inside the cell. Byrd Dep. 32-35. Contrary to Plaintiff's unfounded assertion, I can find no place in his deposition where Officer Byrd states that he did not look inside each cell during the routine patrol.

[10] A "Code Blue" is a medical emergency. (Id. at ¶ 66.)

did not really think that Mr. Villafane had hung himself. (Id. at ¶ 58.) It is not unusual for inmates to feign that they are committing suicide in order to be moved off the block and to the medical unit. (Id. at ¶ 80.) Mr. Betancourt looked back and then believed Mr. Villafane had actually hung himself so he walked to tell Officer Christner, who was at the end of the cellblock. (Id. at ¶ 59, 66.) He told Officer Christner that there was a "Code Blue." (Id. at 60.) Officer Christner called to Officer Byrd that there was a "Code Blue" and Officer Byrd went to Mr. Villafane's cell. (Id. at ¶ 63.)[11]

Officer Byrd, thinking that Mr. Villafane was faking a suicide, first asked him what he was doing, and then reached into the bars and noticed that Mr. Villafane felt like "dead weight." (Id. at ¶ 64-65.) Officer Byrd immediately called a "Code Blue" on his radio for the gate to be opened. (Id.) The door was opened and Officer Byrd tried to lift up Mr. Villafane to relieve the pressure and untie the sheet around his neck. (Id. at ¶ 67.) Officer Todd Plummar, who was assigned to a different block, heard "Code Blue" called on the loudspeaker and was the first to arrive after Officer Byrd. (Id. at ¶ 68.) He helped Officer Byrd lift up Mr. Villafane and then pull him to the floor after Officer Dickert untied the sheet from the top of the bar. (Id.) Medical personnel then arrived and determined that Mr. Villafane had no vital signs and was unresponsive. (Id. at ¶ 70.) The medical staff's attempts to resuscitate Mr. Villafane were unsuccessful. (Id. at ¶ 71.) Firefighters, EMT and LEMSA arrived and took over the care of Mr. Villafane at 2:00 p.m. (Id. at ¶ 72.) A LEMSA supervisor then contacted the LGH-ER doctor to stop

---

[11] Plaintiff avers that Officer Byrd "slowly walked" to the cell. I have reviewed the security camera footage and I find that Officer Byrd moved quickly to Mr. Villafane's cell at the end of the hall after he was notified by Mr. Betancourt that there was a problem. See LCP Ex. 38, Nov. 19, 2008 Video at 14:54-14:56.

resuscitation at 2:11 p.m.  (Id. at ¶ 73.)  The coroner's office arrived at 3:45 p.m. and removed the decedent's body from the block.  (Id. at ¶ 74.)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

A party moving for summary judgment always bears the initial burden of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing relevant portions of the record, including depositions, documents, affidavits, or declarations, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact.  FED. R. CIV. P. 56(c).  Summary judgment is therefore appropriate when the non-moving party fails to rebut the moving party's argument that there is no genuine issue of fact by pointing to evidence that is "sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322; Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992).

Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. The nonmoving party cannot avert summary judgment with speculation or conclusory allegations, such as those found in the pleadings, but rather, must present clear evidence from which a jury can reasonably find in its favor. Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999). Finally, in reviewing a motion for summary judgment, the Court does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion. Siegel Transfer v. Carrier Express, 54 F.3d 1125, 1127 (3d. Cir. 1995).

### III. DISCUSSION

#### A. Deliberate Indifference to Medical Needs / Suicide Claim[12]

Plaintiff alleges that Officer Byrd was deliberately indifferent to Mr. Villafane's serious medical needs and Mr. Villafane committed suicide because of his indifference. A pre-trial detainee's constitutional claims brought under § 1983 are analyzed under the Fourteenth Amendment.[13] The Third Circuit has established a standard to examine

---

[12] Plaintiff stipulates to the withdrawal of her claims against Correction Officers Shepos and Plummar in her Amended Response to Defendants Motion for Summary Judgment, Doc. No. 30-2 at 1, n. 1.

[13] Although Plaintiff does not allege an Eighth Amendment Claim in Count I of her Complaint, she "additionally avers that Defendant Byrd is liable under the Eighth Amendment" in her Amended Response to Defendants' Motion for Summary Judgment, Doc. No. 30-2, at 7. Even if Plaintiff had properly alleged this claim in her Complaint, it is undisputed that Mr. Villafane was a pre-trial detainee, and not a prisoner. Thus, Plaintiff's claims are properly analyzed under the Fourteenth Amendment and not the Eighth Amendment because Eighth Amendment protections do not attach until after the state has secured a formal adjudication of guilt in accordance

liability under § 1983 for cases involving the suicide of a pre-trial detainee. In order to prevail in a prison suicide case under the Fourteenth Amendment, the Plaintiff bears the burden of establishing three elements:

(1) the detainee had a 'particular vulnerability to suicide,'
(2) the custodial officer or officers knew or should have known of that vulnerability, and
(3) those officers 'acted with reckless indifference' to the detainee's particular vulnerability.

Wolosyzn v. Cnty. of Lawrence, 396 F.3d 314, 319 (3d. Cir. 2005) (quoting Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d. Cir. 1991) ("Colburn II")).

### 1. Particular Vulnerability to Suicide

In order to satisfy the first element that the detainee have a "particular vulnerability to suicide," the plaintiff must show that there was "a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." Colburn II, 946 F.2d at 1024. "Particular vulnerability to suicide" occurs when an individual "has been diagnosed by a physician as requiring treatment or one that is obvious that a lay person would easily recognize the necessity for a doctor's attention." Woloszyn, 396 F. 3d at 320 (quoting Colburn II, 946 F.2d at 1023). "The detainee's condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death." Wolosyzn, 396 F.3d at 320.

Here, Dr. Shambaugh, a non-party clinical psychologist, decided to remove Mr. Villafane from suicide watch after observing that his mood had improved gradually, that

---

with due process of law.. See Wood v. City of Lancaster, 2009 U.S. Dist. LEXIS 2123 (E.D. Pa. 2009), aff'd, 2009 U.S. LEXIS 25043 (3d. Cir. 2009).

he did not present as depressed, was forward-looking, wanted his personal belongings back, and wanted to be back with the other inmates.  Mr. Villafane asked to be returned to general population.  Mr. Villafane's desire to be removed from medical housing and denials of suicidal ideation negate the inference that he was particularly vulnerable to suicide.  Mr. Villafane specifically denied suicidal ideation on all six visits with Dr. Shambaugh from November 4, 2008, through and including November 18, 2008, the day prior to Mr. Villafane's suicide.  The release of Mr. Villafane from suicide or mental health observation by Dr. Shambaugh was communicated to LCP staff.  While Plaintiff's counsel contends that Dr. Shambaugh was incorrect in his assessment, they have submitted no medical evidence or testimony to refute Dr. Shambaugh's medical diagnosis and conclusion.  In fact, Plaintiff's counsel dismissed all claims against Dr. Shambaugh and PrimeCare.

     Officer Byrd did not believe that Mr. Villafane presented a risk for suicide.  Officer Byrd informed Mr. Villafane that he should contact Officer Byrd if he had any problems.  He testified that Mr. Villafane's demeanor appeared normal and that he appeared happy that morning.  Furthermore, Mr. Villafane did not appear distraught, depressed, or suicidal.  Mr. Villafane never indicated to Officer Byrd that he was suicidal.  The undisputed facts do not establish that his vulnerability to suicide was obvious such that Officer Byrd would easily recognize the need for medical attention when the clinical psychologist did not recognize that need.  Accordingly, the Plaintiff has failed to establish that a lay person would recognize that there was a strong likelihood, rather than a mere possibility, that Mr. Villafane had a particular vulnerability to suicide.

## 2.   Knew or Should Have Known of that Vulnerability

Even if this Court found that Mr. Villafane had a particular vulnerability to suicide, the Plaintiff cannot establish that Officer Byrd knew or should have known of that vulnerability.  The second prong requires the plaintiffs show that the officials "knew or should have known of a strong likelihood" of suicide.  Colburn II, 946 F.2d at 1024.  Officials have been found to "know" of a particular vulnerability to suicide when they had actual knowledge of an obvious serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities.  Id.  "Should have known" means "something more than a negligent failure to appreciate the risk of suicide . . . though something less than subjective appreciation."  Id. at 1025.

Here, Officer Byrd asked Mr. Villafane questions about whether he was "ok" after another inmate began taunting Mr. Villafane for being a "snitch."  At no time prior to his suicide did Mr. Villafane demonstrate any tendencies that alerted, or should have alerted, Officer Byrd that Mr. Villafane was a high risk of suicide.  Mr. Villafane's intent to commit suicide was unknown and undetected by a trained clinical psychologist.  Officer Byrd testified that Mr. Villafane did not appear to be distraught, depressed, or suicidal and that his demeanor was normal and he appeared to be his happy go-lucky self.  Mr. Villafane never indicated to Officer Byrd that he was going to harm himself.  There are no material facts that establish the defendant's negligent failure to recognize a high risk of suicide, especially where a trained clinical psychologist does not recognize that risk.

Plaintiff contends that Officer Byrd should have known that Mr. Villafane was not acting like his "usual happy go lucky self," that he knew Mr. Villafane was being picked

on due to the nature of his charges, and that the correctional officers did not patrol the block regularly and did not respond to the "Code Blue" calls by inmates. Plaintiff has misstated the record. Officer Byrd testified that he escorted Mr. Villafane to his cell, asked Mr. Villafane if he was "ok" and observed that Mr. Villafane was upbeat and cheerful. Mr. Villafane replied "Ok, I'm good" when Officer Byrd instructed Mr. Villafane to alert him immediately if he was having suicidal thoughts.

    Plaintiff has inaccurately cited the record of Officer Byrd's deposition for the contention that Officer Byrd knew that other inmates on the block were picking on Mr. Villafane due to the nature of his charges. Officer Byrd's testimony reveals that he knew Mr. Villafane had been called a "snitch" by one of the other inmates but he did not know that inmates were picking on him due to his charges. In fact, Officer Byrd testified that he did not know Mr. Villafane's charges. Furthermore, the Plaintiff wrongly asserts that the defendant did not patrol the block regularly on the date of the suicide. Officer Byrd's testimony indicates that he conducted regular patrols on the block throughout his shift and the surveillance video confirms his testimony.

    Finally, Plaintiff's argument that Officer Byrd should have known of Mr. Villafane's suicide attempt is contrary to the undisputed facts in this case. The noise level on C-2 block is typically loud, inmates on the block often yell "Code Blue" in an attempt to get attention or cause disruption when there is no emergency, some inmates were yelling over the other inmates who were yelling "Code Blue" in an attempt to drown out their cries for help, and Officer Byrd testified that he did not hear the inmates yell "Code Blue."

Therefore, the evidence shows that Mr. Villafane's actions, statements, and behavior did not signal that Officer Byrd knew, or should have known, that Mr. Villafane was particularly vulnerable to suicide. While in the presence of Officer Byrd, Mr. Villafane did not express a desire to harm himself and appeared to act upbeat and cheerful. LCP prison officials cannot be expected to keep a close watch on an inmate who no longer displays a need for that watch, especially when a trained psychologist does not believe the inmate is suicidal and when the LCP officials do not have any further knowledge of facts or circumstances that demonstrate a propensity for a suicide attempt. Thus, the Plaintiff has also failed to establish that Officer Byrd knew or should have known of a particular vulnerability to suicide.

### 3. Acted with Reckless Indifference

Even if this Court found that Plaintiff established the first two elements of her § 1983 deliberate indifference claim, the Plaintiff cannot show that the defendant acted with "reckless indifference." Under the third prong, the reckless indifference standard requires the Plaintiff to "illustrate that the Individual Prison Defendants knew or should have known of the [detainee's] serious medical need and that they acted in conscious disregard of that need." Morgan-Mapp v. George W. Hill Corr. Facility, 2008 U.S. Dist. LEXIS 69434 (E.D. Pa. Sept. 12, 2008) (citing Colburn II, 946 F.2d at 1024-25; Woloszyn, 396 F.3d at 321).

Here, the undisputed facts indicate that Mr. Villafane was provided both medical and mental health care while he was incarcerated at LCP. Dr. Shambaugh examined Mr. Villafane six times over a seventeen-day period and opined that Mr. Villafane was not

suicidal. During the two and one half hours that Mr. Villafane was on Pod C-2, Officer Byrd patrolled the block approximately every thirty minutes. Officer Byrd testified that the block was usually loud and he could hear noise, but he could not understand what any particular inmate was saying and did not hear inmates yell "Code Blue." Plaintiff has set forth no facts or evidence that indicate Officer Byrd was recklessly indifferent and acted in conscious disregard of Mr. Villafane's need for medical treatment. Therefore, the plaintiff has failed to establish a material factual dispute for any of the three elements of her § 1983 claim for deliberate indifference on which she will bear the burden of proof at trial. Accordingly, the defendants are entitled to summary judgment on Count I of plaintiff's Complaint.

### B. Excessive Use of Force Claims

Plaintiff asserts a Fourteenth Amendment excessive use of force claim against Sergeant Jacob for an incident that occurred on November 1, 2008. Eighth Amendment cruel and unusual punishment standards apply when analyzing a pretrial detainee's excessive force claim against a prison official under the Due Process Clause of the Fourteenth Amendment. Fuentes v. Wagner, 206 F.3d 335, 347 (3d Cir. 2000). The Plaintiff must show that the force used was applied "maliciously and sadistically to cause harm" and not "in a good-faith effort to maintain or restore discipline." Hudson v. McMillian, 503 U.S. 1, 7 (1992). In Whitley v. Albers, 475 U.S. 312, 321 (1986), the Supreme Court articulated the following factors to guide the inquiry: "(1) the need for the application of force;" (2) "the relationship between the need and the amount of force that was used;" (3) "the extent of the injury inflicted;" (4) "the extent of the threat to the

safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them;" and (5) "any efforts made to temper the severity of a forceful response."  Prison officials are entitled to "wide-ranging deference in the adoption of policies and practices that in their judgment are necessary to preserve internal order and discipline and to maintain institutional security." Whitley, 475 U.S. at 321-22 (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)).

Here, Sergeant Jacob used a reasonable and necessary amount of force against Mr. Villafane to return him to his cell and restore discipline. After yelling "Ok, tough guy," Mr. Villafane acted defiantly when he refused to return to his cell after repeated orders by Officer Brommer. Officer Koltz repeatedly instructed Mr. Villafane to step out of line and return to his cell, but Mr. Villafane continued to refuse to cooperate. After a supervisor arrived and instructed Mr. Villafane to return to his cell, Mr. Villafane again refused. Prison officials then used minimal force in their attempt to escort Mr. Villafane back to his cell peacefully. However, Mr. Villafane pulled away from the officers and a physical struggle ensued with Mr. Villafane and Sergeant Jacob "rumbling and tussling" on the ground. Sergeant Jacob repeatedly told Mr. Villafane to stop resisting during the struggle, but Mr. Villafane ignored this order. Only then did Sergeant Jacob deploy the E.B.I.D. to subdue Mr. Villafane and cease his struggle. The E.B.I.D. was deployed for only nine to ten seconds and had a safety timer to prevent it from being deployed for longer than fifteen seconds. Officers then immediately escorted Mr. Villafane to medical where he was treated for a laceration to the inside of his lower lip and a chipped front tooth.

There is no material fact that would allow a reasonable juror to conclude that Officer Jacob's use of force was not reasonable under the circumstances in this case. Officer Jacob used force for a legitimate purpose when faced with resistance from Mr. Villafane. The officers repeatedly instructed Mr. Villafane to obey orders and only deployed physical force after he ignored those officers and began struggling with Officer Jacob. Furthermore, Mr. Villafane's injuries are no greater than can be expected from his choice to physically struggle with Officer Jacob while he attempted to escort him to his cell. Officer Jacob did not apply force to maliciously or sadistically cause harm and he made a good-faith effort to return Mr. Villafane to his cell before deploying a reasonable amount of force to restore discipline and overcome resistance. There is no dispute of material fact that would allow a reasonable jury to find that excessive force was used. Therefore, defendants are entitled to summary judgment on Count III of the Plaintiff's Complaint.[14]

## III. CONCLUSION

After a careful examination of the record, the undisputed evidence establishes that Mr. Villafane's repeated denials of suicidal ideation and his demeanor and actions with medical personnel and Officer Byrd did not give Officer Byrd reason to believe that Mr. Villafane would suddenly take his own life. Plaintiff has failed to satisfy all three

---

[14] Plaintiff's suit against Warden Guarini in his official capacity as an employee of Lancaster County is a suit against Lancaster County, which Plaintiff has also named as a defendant. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). In order to attribute liability to Lancaster County, Plaintiff must first establish an underlying constitutional violation. See Simmons v. City of Phila., 947 F.2d 1042, 1062 (3d Cir. 1991). Plaintiff has not established a valid constitutional violation against any Defendant, and thus, the first element of her derivative claim is not met. Therefore, Plaintiff's claims against Warden Guarini and Lancaster County are also dismissed.

elements of her § 1983 deliberate indifference claim on which she would bear the burden of proof at trial.  Plaintiff has not come forward with material facts to establish that Mr. Villafane had a "particular vulnerability to suicide," defendants "knew or should have known" of that vulnerability, or the Defendants "acted with reckless indifference."  Therefore, the Defendants are entitled to summary judgment on Plaintiff's deliberate indifference claim.

Plaintiff's excessive use of force claim asserted against Defendant Jacob also fails because the undisputed evidence shows that Mr. Villafane refused to follow the repeated instructions of correctional staff and instead physically resisted and struggled with Officer Jacob, causing him to use reasonable force to restore discipline and overcome the resistance.  Plaintiff's derivative claim against Lancaster County and Warden Guarini fails as a matter of law because she has failed to establish a constitutional violation.  Accordingly, the Defendants are also entitled to summary judgment on the Plaintiff's excessive force claim.

An appropriate Order follows.